WIGGINS FERRY COMPANY, *Appellant* and *Respondent, v.* CHICAGO & ALTON RAILROAD COMPANY, *Appellant* and *Respondent.*

In Banc, April 30, 1895.

1. **Contract Between Ferry and Railroad Companies:** INTERPRETATION. A contract between the Wiggins Ferry Company, the proprietor of a tract of land on the Mississippi river opposite St. Louis, including Bloody Island, and the Chicago & Alton Railroad Company, operating a road to such island, recited the ferry company's object to be to secure the railroad company's ferrying business, and the railroad company's object to be to secure depot grounds, etc., which were therein granted to it by the ferry company; the contract further providing that the railroad company would always employ said ferry company to transport across such river all persons and property taken across, to or from the railroad, and that "no other than the Wiggins Ferry" should ever be employed by the railroad company to cross any passengers or freight coming or going on such road. *Held,* that the contract did not prevent the railroad company from carrying its freight and passengers over the river at the ferry crossing by means of a bridge afterward constructed, but merely prohibited it from employing any other ferry in transporting them.

2. ——: ——: PUBLIC POLICY. A construction of the contract that it prevented the use of the bridge by the railroad company for the transportation of freight and passengers would render it contrary to public policy and void.

3. ——: ——: ——. Where a contract is fairly and reasonably open to two constructions, one making it legal and the other illegal, the former must be adopted.

4. ——: ——: CARRIER: CONVERSION. A shipper of goods has the right to designate the connecting line over which his goods shall be carried and the first carrier is bound to obey the direction of the shipper in respect thereto, and if he does not do so he is liable for conversion.

5. ——: ——: BREACH OF CONTRACT: LOSS OF PROFITS. If, however, the railroad company, by persistent and determined effort, diverted its car transfer business to another ferry, by reason of its failure to make any connection with the Wiggins Ferry Company, so that shippers had no choice of routes across the river, such railroad company, under its contract above mentioned, became liable to the Wiggins Ferry Company for its loss of profits on its business.

6. ——: ——. The railroad is not liable, under said contract, to the Wiggins Ferry Company for loss of profits on cars delivered by it for other railway companies to another ferry for transportation across the river under contracts between them and the ferry company, and with which contract the Wiggins Ferry Company had nothing to do.

7. ——: ——. Nor is such railroad company liable on account of cars delivered by it to another railroad company at Bloody Island, by which they were conveyed down the river eight miles beyond the limits of St. Louis where they were ferried across the river and delivered to connecting carriers; such cars being delivered to such other road by directions of the consignor or consignee.

8. Carrier: POOLING CONTRACT: PARTNERSHIP. A pooling contract entered into between three carriers provided that their joint gross earnings should be divided between them on a fixed basis, each company being required to report its earnings to a pooling auditor, whose duty it was to state the accounts between the contracting parties; it was further provided that transportation rates should be charged by each company according to a schedule to be agreed upon and that there should be no interference by one company with the business of the others. *Held*, that the contract did not constitute the parties thereto partners.

9. Contract, Breach of: MEASURE OF DAMAGES. Where, in an action for breach of contract, the measure of damages applied by the referee was that approved on the former appeal in a prior suit between the same parties and the finding of facts as to the loss of profits, though high, is supported by the evidence, an objection that the damages allowed are excessive will not be sustained.

10. ——: INTEREST. Plaintiff is not entitled to interest on the damages sustained in an action for a breach of contract where the measure of damages is the loss of profits.

*Appeal from St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

AFFIRMED IN PART AND REVERSED IN PART.

*Given Campbell, R. H. Kern* and *William Brown* for Chicago & Alton Railroad Company, appellant and respondent.

(1) . Cars crossed by bridge during ice blockades are excepted by the contract and not chargeable against

defendant. (2) Wabash cars crossed by the Madison County Ferry Company when the St. Charles bridge was down were crossed by procurement of the Wabash Railroad Company and delivered to defendant at Venice by the consent of plaintiff and should not be charged against defendant. (3) Cars sent across by the Missouri Pacific Railroad and other western roads, were delivered to defendant by the bridge company at Bridge Junction, and are not properly chargeable against defendant. (4) Cars which never came in over or went out upon lines of the Chicago & Alton Railroad Company, but which were delivered to it at East St. Louis to be switched, should not have been charged against defendant. (5) Cars billed to East St. Louis by the desire of the consignees, and afterward crossed upon the bridge by their directions, should not be charged against defendant. (6) Cars sent by shippers over the bridge from St. Louis to East St. Louis, should not be charged against defendant. (7) The true construction of the contract and the obligations of the railroad company to the ferry company thereunder. *Wiggins Ferry Co. v. Railroad,* 72 Ill. 360. (8) The contract of April 28, 1864, is contrary to the public policy of the state of Illinois. *First.* The *lex loci contractus* governs. Story's Conflict of Laws, sec. 242; 2 Kent's Com. p. 457; 2 Parsons on Contracts, p. 570; *Railroad v. Boyd,* 91 Ill. 268; *Penn. Co. v. Fairchild,* 69 Ill. 261; *Railroad v. Smith,* 74 Ill. 179; *Evans v. Anderson,* 78 Ill. 558; *Railroad v. Barron,* 83 Ill. 365; *Fortier v. Penn. Co.,* 18 Brad. 260. *Second.* Public policy. Contractual Limitations, pp. 197, 198; Constitution of Ill. 1870, art. 11, sec. 12; 2 Stat. of Ill. [St. & C. Ed.], pp. 1921, 1952, 1954, 1955; 1 Stat. of Ill. [St. & C. Ed.], p. 563; *Railroad v. People,* 56 Ill. 369; *Railroad v. Vincent,* 49 Ill. 33; *People ex rel. v. Railroad,* 55 Ill. 95; *Railroad v. Smith,* 62 Ill. 276;

*Railroad v. People,* 67 Ill. 19; *Hoyt v. Railroad,* 93 Ill. 609; *Co. v. Hill,* 14 Ill. App. 582; *Railroad v. People,* 120 Ill. 206; *Railroad v. Suffern,* 27 Ill. App. 409; *Railroad v. Suffern,* 129 Ill. 274; *Co. v. Co.,* 68 Ill. 489. *Third.* Directions of owners should be obeyed. *Claflin v. Railroad,* 7 Allen, 341; *Vincent v. Railroad,* 49 Ill. 33; *Viner v. Co.,* 50 N. Y. 23; *Devereux v. Barkley,* 2 B. & Ald. 704; *Wright v. Railroad,* 8 Hill (Penn.) 19; *Ela v. Express Co.,* 29 Wis. 611; *Baldwin v. Express Co.,* 23 Ill. 197; Wood's R'y Law, p. 1594, secs. 432, 441, 445, 446; *Scothorn v. Railroad,* 8 Exch. 341; 2 Rorer on Railroads, p. 1224. *Fourth. Ultra Vires.* Green's Brice's Ultra Vires, pp. 32, 120, 371; *Charles River Bridge v. Warren,* 11 Peters, 544; *Railroad v. Ryan,* 11 Kan. 602; *Railway v. Seely,* 45 Mo. 512; *State v. Railroad,* 83 Mo. 144; *Fuller v. Dame,* 18 Pick. 472; *Penn. Co. v. Railroad,* 118 U. S. 290; *Board v. Railroad,* 50 Ind. 85; *Railroad v. Casey,* 26 Pa. St. 307; *Gibbs v. Gas Co.,* 130 U. S. 397; *Iron Co. v. Extension Co.,* 129 U. S. 643. (9) It was the legal right and duty of the railroad company to make use of the bridge as a means of crossing the river. *Ferry v. Wist,* 70 Mo. 657; *Bridge Co. v. Lonergan,* 91 Ill. 513; *People v. Railroad,* 35 Cal. 619; *Taylor's Executors v. Conway,* 1 Black, 603; *Wild v. Chapman,* 2 Iowa, 526; *Challis v. Davis,* 56 Mo. 25. (10) The continued occupation of the land mentioned in the contract, should not be considered in determining the validity of the contract or the liability of defendant in a suit thereon. *Thomas v. Railroad,* 101 U. S. 71; Broom's Legal Maxims *"in pari delicto;" Railroad v. Mather,* 104 Ill. 257; Morawetz on Priv. Corp. sec. 714, *et seq; Marsh v. Railroad,* 64 Ill. 414; *Railway v. Bridge,* 131 U. S. 371; *Parkersburg v. Brown,* 106 U. S. 487; *Chapman v. County,* 107 U. S. 346; *Penn. Co. v. Railroad,* 118 U. S. 370. (11) The court below erred in awarding dam-

ages against appellant for and on account of cars crossed either way upon the bridge, or by the Madison County Ferry Company during the existence of the pool contracts between the Wiggins Ferry Company, the bridge and the Madison County Ferry Company. Parsons on Partnership [2 Ed.], ch. 2, p. 6; 2 Parsons on Contracts, p. 614; 1 Parsons on Contracts, p. 148, sec. 2; 3 Addison on Contracts, sec. 1293; Collyer on Partners, section 641; *Jaccard v. French*, 12 East, 317; *Bostwick v. Champion*, 11 Wend. 571; s. c., 18 Wend. 175; *Waugh v. Carver*, 2 H. Blackstone, 235. (12) The circuit court erred in awarding excessive damages against appellant for supposed breaches of the contract; the true measure of damages being the loss of profits. Practical Political Economy, by Prof. Bonamy Price; 1 Smith's Wealth of Nations, p. 50; 1 John Stewart Mill, Political Economy, p. 483; *United States v. Speed*, 8 Wall, 84; *Masterson v. Brooklyn*, 7 Hill, 61; *Shannan v. Comstock*, 21 Wend. 457; *Hecksher v. McCrea*, 24 Wend. 304; *Burrell v. Saginaw Salt Co.*, 14 Mich. 39; *United States v. Behan*, 110 U. S. 338; *Nears v. Harbent*, 25 Mo. 354. (13) The court below erred in awarding damages against appellant on account of cars crossed from Venice by way of the Madison County Ferry, the town of Venice being three miles north from East St. Louis, on defendant's road. *Mills v. St. Clair, Co.,* 7 Ill. 97; *Mills v. St. Clair Co.*, 8 How. 569; *Gales v. Anderson*, 13 Ill. 424; *Bridge v. Lonergan*, 91 Ill. 513. (14) The court below erred in awarding damages against appellant on account of cars billed to East St. Louis, and from thence crossed by orders of consignees or owners, and on account of freights and passengers delivered to it at East St. Louis. *Railroad v. Wiggins Ferry Co.*, 73 Mo. 389. (15) The court below erred in that it failed to give full faith and credit to the constitution, public acts, laws and decisions of the state of

Illinois in its decisions as to the construction and validity of the contract in evidence; in overruling appellant's exceptions to the referee's report and in rendering judgment against appellant.. (16) The court below erred in overruling appellant's motion for a new trial. *Wiggins Ferry Co. v. Railroad*, 72 Ill. 517. (17) The questions involved herein and raised by appellant in defense to these actions are not *res adjudicata* as against appellant. Bigelow on Estoppel, 37; Freeman on Judgments, sec. 588; 1 Greenleaf, secs. 528, 529, 530; *Hickerson v. Mexico*, 58 Mo. 62; *Sperlock v. Railroad*, 76 Mo. 67; *Lawrence v. Hunt*, 10 Wend. 80. (18) The defendant is not liable to plaintiff for any cars delivered by defendant to the East St. Louis and Carondelet Railroad, and crossed over the river at Carondelet. Sedgwick on Construction [2 Ed.], Pomeroy's notes, p. 291; *Gates v. Anderson*, 13 Ill. 413; *Mills v. St. Clair Co.*, 8 How. 584; *Perrin v. Canal Co.*, 9 How. 172; *Charles River Bridge v. Warren*, 11 Peters, 420; 2 Kent's Com. 338, 340; *Railroad v. Railroad*, 10 La. Ann. 742; *Gas Co. v. Light Co.*, 115 U. S. 656. (19) There was no error in the refusal of the circuit court to allow interest to plaintiff upon the award of the referee. *Railroad v. Wiggins Ferry Co.*, 73 Mo. 389; *Dozier v. German*, 30 Mo. 221; *De Steiger v. Railroad*, 76 Mo. 68; Sedgwick on Damages, 375. (20) The circuit court of the city of St. Louis erred in overruling the several exceptions to the report of the referee.

*Warwick Hough* and *Warwick M. Hough*, also, for Chicago & Alton Railroad Company.

(1) It was no breach of the contract sued on, for the defendant, even where it had contracted to deliver

passengers and freight in the city of St. Louis, to cause such passengers and freight to be transported in cars over the bridge of the Illinois & St. Louis Bridge Company across the Mississippi river, instead of sending the same across said river by way of the plaintiff's ferry. *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389. (2) The contract sued on only obligates the defendant not to employ any other ferry than the plaintiff's ferry, in crossing freight and passengers over the Mississippi river, and it does not obligate the defendant never to use or employ any bridge that might thereafter be erected over the said river, for the purpose of crossing freight and passengers over the said river. *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389. (3) If a contract is fairly susceptible of two constructions, one of which will make it wholly or partly void as being in contravention of public policy, and the other not, that construction will be adopted by the courts which will not so make it void as being in conflict with public policy. Lawson on Contracts [Ed. 1893], p. 389, and note 5; *Hobbs v. McLean*, 117 U. S. 567, *loc. cit.* 576; *U. S. v. Railroad*, 118 U. S. 235. (4) If the court should construe the contract sued on as prohibiting the defendant from using the bridge across the Mississippi river, and as requiring it to use plaintiff's ferry in preference thereto, although such bridge affords the safest, most expeditious, economical and convenient method of crossing said river with freight and passengers, then such construction of the contract makes it void to that extent as being in violation of defendant's duty to the public, and in disregard of the rights of the public, and, therefore, in contravention of public policy. *Wiggins Ferry Company v. Railroad*, 73 Mo. 389. (5) The referee and the circuit court both erred in holding that, because

the defendant is still in possession of the land, an easement in which was granted to it, by the plaintiff, under the contract sued on, and has not offered to restore the possession thereof to the plaintiff, that the defendant is liable in damages to the plaintiff for passengers crossed over the bridge in its passenger cars, although it is established by the testimony that the route by the bridge was more speedy, comfortable and convenient to the passengers, than the route by the plaintiff's ferry. *Transportation Co. v. Pullman Car Co.*, 139 U. S. 24; *Warren v. Jones*, 51 Me. 146; *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389. (6) The statute of the state of Illinois pleaded by the defendant and entitled "an act to facilitate travel and transportation," approved February 25, 1867, was valid and binding upon the defendant notwithstanding the contract entered into by it with the plaintiff and required the defendant to use the bridge in transporting freight and passengers across the Mississippi river. *Railroad v. Bristol*, 9 Sup. Court Rep. p. 423; Taylor on Landlord and Tenant [Ed. 1887], sec. 267; *Ins. Co. v. Andles*, 113 U. S. 575; *Railroad v. P.*, 105 Ill. 657. (7) This court in its decision in the case of the *Wiggins Ferry Company v. Railroad*, 73 Mo. 389, decided only that, where the route across the Mississippi river had not been designated by the consignor of freight, or selected by the passenger, and it became necessary for the defendant as a common carrier of freight and passengers to employ a ferry to transport across the Mississippi river such passengers and freight brought by it to the eastern shore of said river, opposite to the city of St. Louis, that it was its duty to employ the ferry of the plaintiff; and to that extent, and to that extent only, is the decision in that a case a binding authority in this.

*Geo. A. Madill* and *Thomas E. Ralston* for Wiggins Ferry Company, appellant and respondent.

(1) The plaintiff, and the Alton and St. Louis railroad company and the assignee of said last named company, the defendant, had power, under their respective charters, to make the contract of April 28, 1864, declared on in this suit. (2) The contract is not *ultra vires* of either the plaintiff or defendant to make. *Ferry Company v. Railroad*, 73 Mo. 406, 407; *Railroad v. Wiggins Ferry Company*, 119 U. S. 615–624; *Wiggins Ferry Company v. Railroad*, 142 U. S. 396; *Railroad v. Steamboat Co.*, 107 U. S. 98; *Railroad v. Railroad*, 110 U. S. 667; Spelling on Trusts and Monopolies, sec. 3, p. 185; Morawetz on Corp. [2 Ed.], sec. 118. (3) Said contract is not in restraint of trade. *Ferry Co. v. Railroad*, 73 Mo. 410, 411. (4) No provision of said contract, or any act required by it of the plaintiff or defendant, is contrary to public policy. *Ferry Company v. Railroad*, 73 Mo. 389; *Railroad v. Ferry Company*, 119 U. S. 619; *Ferry Co. v. Railroad*, 72 Ill. 363, dissenting opinion of Justices Walker, Breese and Scholfield; *Wiggins Ferry Company v. Railroad*, 142 U. S. 615; *Bridge Co. v. Railroad*, 37 Fed. Rep. 567; *Railroad v. Richmond*, 19 Wall. 584; *Richmond v. Railroad*, 33 Iowa, 497; *Towboat Co. v. Railroad*, 24 La. Ann. 1. (5) An objection that the contract violates some rule of public policy will not be entertained, unless such rule be clear, distinct and imperative, and the alleged violation free from all doubt. *Richmond v. Railroad*, 26 Iowa, 191; *Wright v. Pipe Line Company*, 101 Pa. St. 206; Ray on Contractual Relations, pp. 263, 145; Spelling on Trusts and Monopolies, ch. 1, pp. 1, 2; *Printing, etc., Co. v. Sampson*, L. R. 19 Eq. pp. 462–465; *Richardson v. Mellish*, 5 T. R. 599; *Woodruff v. Berry*, 40 Ark. 251.

(6) And where the parties are not in *pari delicto*, as here, the contract so far as executed will be enforced. *Railroad v. Railroad*, 20 Atl. Rep. p. 383. (7) But courts will take notice, although the question is not raised by counsel or pleaded, of illegal contracts which come before them for adjudication, and will adjudge them illegal and void. *Richardson. v. Buhl*, 77 Mich. p. 632; *Oscanyan v. Winchester Arms Co.*, 103 U. S. 261. (8) And, even if the contract were subject to an objection on the ground of *ultra vires* or public policy (which plaintiff denies), still, in the language of this court, the defendant, in order "to make such plea effectual, should restore, or be required to restore, all that he (it) has received as a consideration for the promise which he (it) thus seeks to avoid. *Ferry Co. v. Railroad*, 73 Mo. 411; *Warren v. Jones*, 51 Me. 146; *Joy v. St. Louis*, 138 U. S. 40; *Railroad v. Transportation Co.*, 83 Pa. St. 160. (9) The erection and opening to use of the Illinois and St. Louis bridge did not change the rights or duties or obligations of plaintiff or defendant under the contract of April 28, 1864. *First.* Said contract being valid when made, no subsequent change in the conditions for doing business could render it either illegal or *ultra vires* or contrary to public policy, or release the defendant from its obligations thereunder. *Richmond v. Railroad*, 33 Iowa, 422; *Railroad v. Richmond*, 19 Wall. 584; *Bridge Co. v. Railroad*, 37 Fed. Rep. 567. *Second.* The Illinois and St. Louis bridge is not a railroad or railroad corporation. Therefore the railroad legislation of Illinois is not applicable to said bridge. *Third.* The Illinois and St. Louis bridge is not a common carrier of either passengers or freight, as it owned no engines, or passenger or freight cars. Nor had it authority, under its charter, to operate any trains. *Bridge Co. v. Railroad*, 37 Fed. Rep. 615–620; 14 U. S. Stat. at

Large, p. 66; *Ibid.*, p. 244. *Fourth.* Nothing in the law of the state of Illinois required or compelled the defendant to use the bridge for the purpose of transporting over it, to or from St. Louis, either freight or passenger cars. And the defendant is liable on the contract sued on. *Richmond v. Railroad*, 33 Iowa, 497–500; *Railroad v. Richmond*, 19 Wall. 584–590; *Bridge Co. v. Railroad*, 37 Fed. Rep. 584; *Mattingly v. Company*, 3 Inter. Com. Com. Rep. 592; *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389. *Fifth.* The referee found, under the proofs in the case, that defendant did, as a matter of fact, control the method by which all cars crossed the Mississippi river, opposite St. Louis, either going to or coming from its road. And this rendered defendant liable on the contract sued on. Authorities *supra*. *Sixth.* The terminus of defendant's railroad being on Bloody Island, as claimed by defendant, it was obliged by its charter to run all passenger tains to and from such terminus. And its action in crossing its trains by the bridge, leaving its railroad, for this purpose, about a mile northwest of its terminus, was a continually recurring violation of its charter and abandonment of its duty, to correct which *mandamus* could have been invoked. *Railroad v. People*, 143 Ill. 434. *Seventh.* The defendant having the legal right to control the method by which all cars, either to or from its road, should cross the river at St. Louis, its failure to exercise such right in favor of the plaintiff's ferry was a violation of its said contract with plaintiff. *Richmond v. Railroad*, 33 Iowa, 497; *Mattingly v. Pennsylvania Co.*, 3 Inter. Com. Com. Rep., 592; *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389; *People v. Railroad*, 55 Ill. 95; *Railroad v. Railroad*, 51 Fed. Rep. 465. *Eighth.* The terminus of defendant's road being on Bloody Island, as claimed by defendant, it was not bound to send its own cars,

or any foreign cars in its possession, whether freight
or passenger, across said bridge, or to receive for
transportation over any part of its road, foreign cars
coming to its road from said bridge. And in sending,
or permitting to be taken, either its own cars or foreign
cars in its possession, across said bridge, and in receiv-
ing either its owns cars, or foreign cars, from said
bridge to be carried over any part of its road, defend-
ant acted voluntarily, without compulsion of law and
in violation of its contract with plaintiff. And the
alleged directions of consignors and consignees could
not constitute any legal excuse to defendant for such
violation of said contract. *Wiggins Ferry Co. v.
Railroad*, 73 Mo. 410; *People ex rel. v. Railroad*, 55
Ill. 95; *Hoyt v. Railroad*, 93 Ill. 601; *Railroad v.
Railroad*, 110 U. S. 667; *Mattingly v. Pennsylvania
Co.*, 3 Inter. Com. Com. Rep. 592. *Ninth.* If the
terminus of defendant's railroad was St. Louis, then
it was bound by the contract of April 28, 1864, to
employ plaintiff's ferry for all cars and passengers
which were carried over the river opposite the city of
St. Louis. *Wiggins Ferry Company v. Railroad*, 73
Mo. 409; *Wiggins Ferry Co. v. Railroad*, 142 U. S.
396; *Richmond v. Railroad*, 33 Iowa, 497; *Railroad v.
Richmond*, 19 Wall. 584; *Bridge Co. v. Railroad*, 37
Fed. Rep. 584. (10) The compliance by the defend-
ant with the requirements of its contract with the
plaintiff would not have resulted in "unjust discrimi-
nation," even though, to reach particular points in
St. Louis, the necessary cost to the shipper, or con-
signee, of transportation over the river by plaintiff's
ferry had, in fact, been greater than by way of the
bridge, or even though the profit earned by the defend-
ant had thereby been diminished. *Railroad v. Coal
Co.*, 79 Ill. 121; *Mattingly v. Pennsylvania Co.*, 3
Inter. Com. Com. Rep. 592, *et seq.; Bridge Co. v.*

*Railroad*, 37 Fed. Rep. 567, *et seq.* (11) Laws against "unjust discrimination" or providing for "continuous lines of travel," whether state or federal, do not impair the obligation of the contract sued on. Authorities last cited, and also *Railroad v. Richmond*, 19 Wall. 584–590; *Richmond v. Railroad*, 33 Iowa, 422. (12) Under the contract of April 28, 1864, the defendant was bound to give to plaintiff the profits of all freight and passengers crossed over the Mississippi river, either way, to or from its railroad. And this obligation embraced the entire Illinois shore of the Mississippi river opposite the corporate limits of the city of St. Louis, including Carondelet after it was added to the city of St. Louis on the fourth day of March, 1870 (Laws of 1870, pp. 461 and 490). *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389; *St. Louis v. Gas Light Co.*, 46 Mo. 121; *Wiggins Ferry Co. v. Railroad*, 142 U. S. 396; *Bridge Co. v. Railroad*, 37 Fed. Rep. 584. *First.* The use of the Madison county ferry, for the transportation of defendant's cars over the river, either way, was a violation of said contract. Authorities *supra*. *Second.* The consent by defendant that its cars should be crossed, either way, over the river, *via* the Madison county ferry, or the bridge or the Carondelet ferry, independent of any active cooperation on its part in procuring such crossing, was a violation of said contract. *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389. *Third.* The active cooperation of defendant in procuring its cars to be crossed, both ways, *via* the Madison county ferry, the bridge and the Carondelet ferry, as shown by the testimony, establishes a willful violation by defendant of said contract. See cases cited under the last head *supra*. (13) The delivery of loaded cars, which had come over defendant's road to the depot acquired of plaintiff in east St. Louis, by the defendant to the Conlogue

railroad, to be hauled to Carondelet and crossed over the river by the Carondelet ferry, at Carondelet (which became a portion of the city of St. Louis in March, 1870), was a violation of the contract of April 28, 1864, and entitled the plaintiff to recover for the loss of the ferriage of such cars. The number of these cars, ascertained by referee, was nine thousand, nine hundred and eighty-three. Cases last above cited; and, also, *Wiggins Ferry Co. v. Railroad*, 142 U. S. 396; *St. Louis v. Gas Light Co.*, 46 Mo. 121. (14) The plaintiff, although not bound to provide car transfer for defendants without its request, did, nevertheless, provide such facilities, but the defendant refused to use or permit them to be used. Hence defendant can not be heard to say that either the shipper or consignee chose some other route across the river, as a choice of plaintiff's ferry for car transfer was, made of no avail by defendant's conduct. *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389; *Richmond v. Railroad*, 33 Iowa, 422. (15) Neither the pool contracts introduced in evidence, nor any action had under them, furnishes any defense to plaintiff's claim for damages for the cars crossed on the Madison county ferry or the bridge during the continuance of said contracts. *First*. No such defense was pleaded or embraced in the issues in this case. The view taken of these contracts by the referee and his finding and conclusion with reference thereto are a complete answer to the defendant's position in respect of said contracts. 2 Beach on Corp., sec. 844, p. 1321; *Converse v. Company*, 33 Conn. 167; *Gunn v. Railroad*, 74 Ga. 509. (16) The plaintiff was entitled to interest on all amounts found in its favor by the referee (including also the nine thousand, nine hundred and eighty-three westbound loaded cars delivered to the Conlogue road by defendant), from March 22, 1892, the date of the filing in the circuit

court of the referee's report, as plaintiff's demand was then fixed and liquidated. 1 Am. L. Cases, p. 649; *Hammond v. Hammond*, 2 Bland, Ch. 307; *Hunn v. Norton*, Hopkins, 344; *Tighlman v. Proctor*, 136 U. S. 136; *Railroad v. Turrill*, 110 U. S. 301; 1 Sedgwick on Damages [8 Ed.], sec. 335; *Gibson v. Cincinnati Enquirer*, 2 Flip. 88; *Commonwealth v. Railroad*, 3 Cush. 25; *Johnson v. Railroad*, 43 N. H. 410. (17) All questions which can properly arise for consideration in this case are *res adjudicata* between the parties to this suit. All such questions were included in the issues in a former suit by this plaintiff against this defendant (the record of which suit was introduced in evidence in this case) and were decided by this court, at the April term thereof for 1881, and reported in 73 Mo. 389. *Ferry Company v. Railroad*, 73 Mo. 389; *Railroad v. Wiggins Ferry Co.*, 119 U. S. 615; *Wiggins Ferry Co. v. Railroad*, 142 U. S. 396; *Lumber Company v. Buchtel*, 101 U. S. 638; *Harmon v. Auditor*, 123 Ill. 122; *Mason v. Summers*, 24 Mo. App. 174; *Henry v. Woods*, 77 Mo. 280.

*G. A. Finkelnburg*, also, for Wiggins Ferry Company.

### DIVISION ONE.

BLACK, P. J.—The plaintiff, the Wiggins Ferry Company, is a corporation created under the laws of the state of Illinois; and the defendant is a railroad corporation organized under the laws of the same state. The ferry company owned a tract of land in that state, opposite the city of St. Louis, having a front of two and one half miles on the Mississippi river, including in such front Bloody Island. It has, and during all the time in question had, the exclusive right to operate a steam ferry from any point or points on its river front to the city of St. Louis. The de-

.fendant has the charter power to own and operate a railroad from Chicago to Bloody Island, with power to transport passengers and freight, "to St. Louis, Missouri, and for that purpose to construct, own and use such boat or boats as may be necessary."

On the twenty-eighth of April, 1864, the Alton & St. Louis Railroad Company, another Illinois corporation, and the ferry company entered into a written contract. On the same day the Alton & St. Louis Railroad Company assigned this contract to the defendant, the Chicago & Alton Railroad Company. The last named company by the assignment and operation of law became bound to perform all the covenants of its assignor, so that we may treat it as the party of the second part to the contract. *Wiggins Ferry Company v. Railroad*, 73 Mo. 389.

The plaintiff commenced two suits, one on the thirteenth of August, 1875, and the other on the nineteenth of September, 1881, to recover damages for breaches of the contract, the breaches covering a period of time from the eighth of June, 1872, to the nineteenth of September, 1881. Thereafter the suits were consolidated, and the cause sent to a referee. The referee found for the plaintiff and made report to the court that the plaintiff should recover damages as follows:

| | |
|---|---:|
| Cars crossed by Madison ferry, 43,055 at $3.50 per car.......$ | 150,962 50 |
| Cars crossed by bridge, 42,817 at $3.50 per car .. ........ | 149,859 50 |
| Passengers in cars and omnibuses, 1,020,536, at 5c. each.... | 51,026 80 |
| Baggage-wagons and omnibuses........................ ..... | 3,578 60 |
| Money rental....................... ....... .......... ...... | 23,125 00 |
| Total ..................................... ..... .. ....$ | 378,282 40 |

Both parties filed exceptions to the report, all of which were overruled, and the court gave judgment according to the report, from which both parties .appealed.

To the better understanding of the contract it may be stated here that at the date thereof Bloody Island was connected with the main shore and a small village thereon called Illinois Town by a single dyke. The island was at that time the terminal point of two or three railroads only, and the city of St. Louis was the real terminal point for all freight contracts, rates being made to St. Louis, including therein transfer charges. The ferry was then the only means provided for crossing the river. There was then another duly incorporated ferry company known as the Madison County Ferry Company, which operated a ferry from Venice down the river to St. Louis. Venice is some two and a half or three miles north of Bloody Island. The contract to which the defendant became the party of the second part and the Wiggins Ferry Company the party of the first part, and upon which this suit is founded, provides, among other things:

"That, whereas the said parties are both anxious to secure permanently to themselves respectively and to their assigns the objects hereinafter mentioned, that is to say, the party of the first part, the ferrying business, between the Illinois and the Missouri shore opposite to the city of St. Louis of all the freights and passengers, carried or to be carried by the above party of the second part, and also the further sum of $2,500 per annum, to be paid by the said party of the second part to the said party of the first part, as hereinafter specified, and the said party of the second part, the securing of proper facilities for depot grounds for the operations and doing of business of their road at its western terminus on the Mississippi river opposite to the city of St. Louis. Now, for the purpose of carrying out the above mentioned objects the said parties have agreed and covenanted as follows, that is to say:

"The said ferry company, party of the first part,

in consideration of the covenants and stipulations of the said railroad company, party of the second part, herein contained to be observed and fulfilled by the said party of the second part, does give, grant and convey" to the railroad company the right to use for tracks, warehouses and other railroad buildings, a parcel of ground on Bloody Island, having a front of four hundred feet and a depth of one thousand, five hundred feet, which tract is duly described. "In consideration of said covenants, the said party of the first part, further agrees to furnish and maintain good and convenient wharfboats and steam ferryboats to do with promptness and dispatch all the ferrying required for the transit of passengers and freight coming from or going to said railroad over the river, navigation permitting, except that the said ferry company may abandon the business at any time by giving the railroad company six months' notice of their determination to do so, in which event the right of the said party of the second part herein to the possession of the parcel of ground above specified shall remain unaffected, excepting as to the payment of the said $2,500, which are to be paid in any event. * * *

"In consideration of the lease aforesaid and the covenants entered into on the part of the said ferry company, the said railroad company covenants and agrees that they will always employ the said ferry company to transport across the said river all persons and property which may be taken across said river either way to or from the Illinois shore, either for the purpose of being transported on said railroad or having been brought to the said river, Mississippi, upon said railroad, so that the said ferry company, its legal representatives or assigns, owners of the said ferry, shall have the profits of the transportation of said passengers, persons and property taken across said river,

either way by the said railroad company, and that no other than the Wiggins ferry, shall ever at any time, be employed by the said party of the second part, to cross any passengers or freight coming or going on said road.''

The defendant entered upon the parcel of land, filled it up, and placed thereon its tracks, depot, and other railroad buildings, and has ever since used the same for railroad purposes.  Thereafter, and in 1866, the defendant made a contract with the Madison Ferry Company, whereby the defendant extended its tracks from the main line at Venice to the ferry landing at that place and also extended side tracks from Bloody Island to the ferry landing at Venice.  In 1869 the Madison ferry began transferring loaded and unloaded cars, and the defendant then and thereafter until the opening of the bridge as hereafter stated, diverted all such business to that ferry.  Some of the officers of that ferry company were also officers of the defendant company, and this fact accounts for the diversion of business from the plaintiff to the Madison ferry.  In 1870, the plaintiff began the transfer of cars, loaded and unloaded, from Bloody Island to St. Louis, and from that time on was prepared and equipped with boats and incline planes to do all such business as well as piece and wagon freight.  This diversion of cars to the Madison Ferry Company constituted the subject-matter of the former suit.  And it is this car transfer business diverted to the Madison ferry from eighth of June, 1872, to nineteenth of September, 1881, for which the referee allowed the plaintiff $150,692.50 in this suit.

As to the other damages allowed by the referee in this case, the essential facts are to the following effect: The St. Louis & Illinois Bridge Company was incorporated under an act of this state, approved 1864 and

amended in 1865 (Laws of 1863 and 1864, p. 255, and Laws 1864 and 1865, p. 227), and an act of Illinois, approved in 1865 (Private Laws of Ill., of 1865, Vol. 1, p. 191). These laws gave to the bridge company power to build a bridge across the river at St. Louis, with the right to charge tolls for the passage of persons, vehicles and cars; but it was not authorized to operate a railroad. The act of Illinois provides, among other things: "Should said bridge be built with railroad tracks, the said company shall suffer and permit the railroad companies whose terminus is now on Bloody Island, opposite the city of St. Louis, aforesaid, or which may hereafter terminate there, to cross upon said bridge with their cars, locomotives and trains." And any railroad company "whose terminus is now on Bloody Island, aforesaid, shall have power of becoming an incorporator in said bridge company." Pursuant to these laws and the act of congress of the twenty-fifth of July, 1866, the bridge company constructed a bridge with railroad tracks for the passage of railroad trains. The wagon roadway of the bridge was opened for public use on the thirteenth of June, 1874; and the bridge was opened for the passage of loaded freight cars in September of that year, and for the passage of passenger cars in June, 1875. Before the opening of the bridge, the defendants's passengers crossed the river in omnibuses on the plaintiff's ferry. After the opening of the bridge to wagon traffic, the same omnibus used the bridge. When the bridge was opened to passengers and freight cars, the defendant sent its passenger cars by that route, and also many of its freight cars. The railroad over the bridge was operated by the Bridge and Tunnel Company, to which the passenger and freight cars were delivered to be hauled to and from the Union depot on the Missouri side.

1. We shall first consider the alleged breaches

arising from the use of the bridge. The plaintiff takes the broad ground that the contract requires the defendant to give to it the crossing of all of the defendant's passengers and freight, going either to or from St. Louis; and that the use of the bridge for the purpose of crossing passengers or freight was and is a breach of the contract, for which plaintiff should be allowed damages.

We do not agree to this construction of the contract for two reasons. In the first place, the contract undertakes to secure to the plaintiff the defendant's ferrying business; but it does not undertake to deprive defendant of the right to use any other method or means of transferring its passengers and freight over the river. This, we think, is clear; for the contract starts out by declaring the general object which the parties have in view. As to the plaintiff, the object is to secure the *ferrying business* of the defendant. To this end the plaintiff agrees to do with promptness and dispatch all the ferrying required for the transit of passengers and freight coming or going. The defendant covenants that it will always employ the plaintiff to do such business; so that the ferry company "shall have the profits of the transportation of all such passengers, persons and property taken across said river either way by said railroad company; and that no other than the Wiggins ferry shall ever at any time be employed by the said second party to cross any passenger or freight coming or going on said road." The result is the same, whether we look to the general or particular provisions of the contract. It is the defendant's ferrying business which the contract in all of its parts seems to secure to the plaintiff, and it is that and that alone of which it speaks. When the contract says no other than the Wiggins ferry shall be employed by the defendant it means no other ferry. The prohibition does not go to

any other method or means of crossing the river. This seems to be the view taken by this court in the former case; for it was then said: "The only element of restraint of trade to be found in the obligation of defendant is that it will never employ any other ferry but the Wiggins ferry to transport freight from the Illinois shore, opposite the city of St. Louis, or sent to it from said city." (P. 410.) A ferry was then the only means in use for crossing the river at St. Louis; and it is evident the parties did not have in mind any other method of transferring passengers or freight. The contract is, in any view that can be taken of it, to some extent in restraint of trade, and for this reason it should be strictly construed. The contract left the defendant perfectly free to use the bridge for the transfer of passengers and freight, and that, too, without any liability to the plaintiff therefor.

In the second place, let it be conceded that the contract is open to the construction which the plaintiff seeks to place upon it. The law is well settled that where a contract is fairly and reasonably open to two constructions, one making it legal and the other illegal, the former must be adopted. *Lamar Water Co. v. The City of Lamar, ante,* p. 188; *Hobbs v. McLean,* 117 U. S. 567; *Guernsey v. Cook,* 120 Mass. 501; Lawson on Contracts, sec. 389. The question then arises whether the contract construed as the plaintiff would have us construe it, is legal or illegal. If illegal on the plaintiff's construction, it is not because it is strictly *ultra vires,* but because it is against public policy or the policy of the law. In the former case between these parties it was held that the contract was not objectionable on the ground of public policy, but it must be remembered that the cause of action then under consideration had nothing to do with traffic over the bridge. The cause of action then considered accrued before the bridge

was completed.    The question was whether the defend-
ant had the right to divert the business of transferring.
cars to the Madison ferry, leaving to the plaintiff the
passenger business and the business of transferring
piece and wagon freight.    That case did not involve
the question whether the defendant has the right, not-
withstanding the contract, to use the bridge.    It was
then said:   "While holding the contract   *   *   *   to·
be valid, yet if it is shown by extrinsic evidence to be
in conflict with public policy, to that extent it must.
yield and give way, and it is for the defendant affirming·
it to be so, to show it."   (P. 411.)   The turning point.
of the ruling then made is found in the following lan-
guage then used:   "It was no concern of the public·
what particular ferry should be employed by defendant
as an instrumentality for the prompt passage over the·
river of all freight and passengers requiring such transit,
provided the one employed was in all respects sufficient
to accomplish such purpose without imposing any addi-
tional burdens on the shipper."   (P. 410.)

It is on this ground, namely, that the public would
be as well served by one company as another doing
business in the same way and by the same means, that.
the rulings in the following cases, to which we are cited
by the plaintiff, are made to stand: *Express Cases*, 117,
U. S. 1; *Railroad v. Pullman Car Co.*, 139 U. S. 79;
*Railroad v. Richmond*, 19 Wall. 584; *Richmond v. Rail-
road*, 26 Iowa, 191; *Omaha Bridge Cases*, 10 U. S. App.
98.    These cases do not question or doubt what was.
said in *Thomas v. Railroad*, 101 U. S. 71.    In that case
Mr. Justice MILLER used this language:   "There is.
another principle of equal importance and equally con-
clusive against the validity of this contract, which, if
not coming exactly within the doctrine of *ultra vires*
as we have just discussed it, shows very clearly that the·
railroad company was without the power to make such

a contract. That principle is that, where a corporation, like a railroad company, has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions * * * without the consent of the state * * * is void as against public policy." This doctrine was again asserted in *Central Transportation Co. v. Pullman's Car Co.*, 139 U. S. 24.

The same principle is asserted in unqualified terms by the supreme court of Illinois, and it is according to the laws of that state that this contract must be construed. In *Railroad v. People ex rel.*, 56 Ill. 365, the company refused the deliver grain in bulk to a warehouse to which the grain was consigned, the warehouse being on the line of the road. The company attempted to justify its conduct under a contract made with other elevator companies. The court held, in substance, that railroad companies in that state are carriers at common law; that they are created and invested with the power of eminent domain for the public good and must perform their duties to the public, and that contracts made by them in defiance of such duties are void. Many other cases cited from the same court are to the same effect. See, also, *Railroad v. Taylor*, 6 Col. 1; *Railroad v. Seely*, 45 Mo. 212; *State v. Railroad*, 29 Conn. 538.

There can be no doubt as to the correctness of the general rules of law just stated; and it follows that any contract made by a railroad company which ties up its hands and disables it from performing its duties to the public is void because forbidden by public policy. The only real question here is whether this contract comes within the rule. Now, it is one thing to say it is no concern of the public what particular ferry the defendant may agree to employ, so long as the one employed

is in all respects well equipped and imposes upon the passenger no additional inconvenience or expense. But it is another and a very different thing to say that it is no concern of the public whether the defendant employs a ferry or a bridge in transporting its passengers and freight over a great river like the Mississippi. The two methods of transit are entirely different. The ferry is in no sense equal, in convenience, comfort and dispatch, to the bridge, and this every man of common observation knows full well. And it may be observed here that the shipper of goods has the undoubted right to designate over what connecting lines his goods shall be shipped, and the first carrier is bound to obey the directions of the shipper in this respect, and, if he disobeys them, he is liable as for a conversion. Hutchinson on Carriers [2 Ed.], sec. 102a. See, also, notes to *Railroad v. Hill*, 40 Am. & Eng. R. R. Cases, 145.

Again, the act of the legislature of Illinois before mentioned provides that the bridge company shall permit any railroad company terminating on Bloody Island to cross the bridge with its cars. This act is, of itself, enough to show that it is the policy of the statute laws of that state that railroad companies shall be free to use the bridge.

We can conceive of nothing more at war with public policy than to say this defendant may by contract deprive itself of the power to use the bridge in the transportation of passengers and freight across the river. It is, therefore, clear, on plain principles of law, that, if we construe the contract in question as the plaintiff insists we should construe it, it is void, and the defendant was in duty bound to disregard it. As the construction of the contract contended for by the plaintiff would make it illegal and void, we must give to the contract that reading which makes it valid. We, therefore, conclude that the defendant had a perfect

right to use the bridge from the time it was first open to wagon transfer, and in so doing it made no breach of the contract. The plaintiff is, therefore, not entitled to recover the following items of damage allowed by the referee, that is to say, $149, 859.50; $51,026.80; and $3,578.60. These amounts should have been excluded, and the defendant's exceptions thereto should have been sustained.

The conclusion just stated renders it unnecessary to discuss other objections made to these items of damage.

2. This brings us to the item of $150,692.50 allowed by the referee because of cars transferred at Venice by the Madison ferry. While the defendant's tracks ended at Bloody Island, it had power to make through contracts to St. Louis, as a continuous carrier, using its own or other agencies for crossing the river. On the other hand it had the right to treat any ferry or bridge company as a connecting carrier, by making its contracts in that way. On the trial of this case defendant insisted that its obligation as a carrier of west bound freight ended at East St. Louis and at Venice; and that its obligation as a carrier of east bound freight did not begin until the cars were delivered to it at East St. Louis or at Venice. In support of this claim it was shown that most of the west bound cars, which were crossed at Venice, were billed by way of Venice on the Madison county ferry. But it is shown on the other hand beyond all doubt that there was a persistent and continued determination on the part of the defendant to divert its car transfer business to the Madison ferry; and, until the opening of the bridge, shippers had no choice of routes, for the defendant.studiously failed and neglected to make any connection with the incline transfer tracks of the plaintiff's ferry company. Indeed the referee found, and

that, too, on an abundance of evidence, that defendant caused the cars to be billed by the way of the Madison ferry, and that in most instances the shippers gave no directions.

On this subject it was said in the former case: "While we recognize the right of the shipper to direct the route by which his goods shall be carried, and the corresponding duty of the carrier to obey the direction, we do not think the principle can be invoked by defendant in this case to relieve it from responsibility incurred under the contract of 1864, for the reason that the evidence tends strongly, if not conclusively, to show that the defendant, by its action in the premises, had reduced the shipper to the necessity of electing to take either wagon or piece transfer at Wiggins ferry, or car transfer at the Venice ferry, and thus forced the shipper to accept car transfer at Venice, thereby subjecting his goods to transportation on the water a distance twice as great as that to which they would have been subjected if transferred by the Wiggins ferry." (P. 418.) We adhere to what was there ruled as to cars crossed by the Madison ferry.

The referee has, however, included some cars which in our opinion do not come within the rule then declared. In the first place, it appears the bridge of the Wabash Railroad Company, at St. Charles, fell in the fall of 1879. During two or three months while that bridge was down, the Wabash sent cars over the Madison ferry to defendant, and the defendant hauled them from that place over its road to Mexico and there delivered them to the Wabash. The defendant also hauled cars for the Wabash from Mexico to Venice, where they were turned over to the Madison ferry. The Wabash made its own contract with that ferry company, and paid the ferry charges itself. Manifests were not made of these cars as in other cases. At

that time there was in existence a pooling contract between the Madison ferry, the bridge company, and the Wiggins company, fixing the rates of ferriage, and the Wiggins company agreed that the Wabash should have a rate of $3.50 per car instead of $5 per car, the regular rate, because of its misfortune. It is perfectly clear that the defendant had nothing to do with this contract by which the Madison ferry crossed these cars, the number crossed being twelve hundred and forty-nine. In the next place, there were two hundred and two cars crossed by the Madison ferry for railroad companies other than the defendant, and with which defendant had nothing to do, save that it switched them from the ferry landing to elevators and other tracks in East St. Louis. On these fourteen hundred and fifty-one cars the referee allowed profits at the rate of $3.50 per car. The exceptions to these items, amounting to $5,078.50 should have been sustained.

3. On the first of July, 1879, a pooling contract was made by and between the bridge and tunnel company, the Wiggins company and the Madison company, to continue for one year. The contract provides that the "business of transferring freight in cars and railway equipments" over the river "shall be conducted as a joint interest and the joint gross earnings derived therefrom shall be pooled and divided between the parties," the Madison company to have nine and one half per cent. of such earnings, and the other companies the remainder, of which remainder the bridge company shall have seventy-five per cent. and the Wiggins company twenty-five per cent. This contract provides for a pool auditor to receive reports and make settlements; that rates shall be charged by each company according to a schedule to be agreed upon from time to time, and that there shall be no interference by one party with the business of the others.

This agreement was continued for two years from first of July, 1879. It clearly appears this contract was not made to increase ferry rates, but it was made for the sole purpose of preserving reasonable rates and to prevent ruinous competition. On this state of facts the defendant insists that the pool contract made the three parties thereto partners, that payment of ferry charges to the auditor was payment to the partnership, and that plaintiff ought not to be allowed two payments of the same demand.

The ferry charges were not paid to the pool auditor. Each company transacted its own business, was bound for its own ferry contracts and undertakings, and the other companies were in no way liable therefor. The three companies simply reported earnings to the pool auditor, and he stated the accounts. Such a contract as that here in question does not make the parties thereto partners. 2 Beach on Private Corporations, sec. 844. Nor is the plaintiff suing to recover a second payment of the same demand. It is suing for damages because of a breach of the contract, by which breach the defendant diverted the trade to which plaintiff was entitled under the contract. This loss of trade, it must be presumed, counted against the plaintiff in fixing its share of gross earnings under the pool contract. Moreover, the defendant is no party to this pooling contract, has had nothing to do with it, and the existence of the contract constitutes no defense, whatever, to the plaintiff's demand.

4. It is next insisted that the damages awarded by the referee are excessive in this, that he allowed more than loss of profits. On this subject the referee says:

"The evidence shows that plaintiff provided and maintained during the period of suit, all the boats, inclines, wharfboats, and necessary equipments and

appliances to transport defendant's cars. It had incurred all the necessary expense. It required the same number of men and amount of coal, and the expense was the same to run the transfer boats, light or loaded. So far as equipment of plaintiff is concerned, all defendant's business could have been transported without additional expense to plaintiff, and the evidence fully shows, that if defendant had allowed its business to be so carried, the reasonable price for its transportation would have been practically a net profit to plaintiff. The amount of profit lost by plaintiff by reason of defendant's refusal to comply with its obligations will be found by ascertaining the reasonable rates for the transfer across the river of the property and passengers included within the terms of the contract; from this, deduct the switching charges and other necessary expenses incurred by plaintiff in doing the business of the defendant, and multiply the number of cars * * * by the rates so found, and deduct from the result any credit which may be found due defendant in the way of mitigation of damages.''

The referee, as has been shown, guided by his findings as to the facts, and by the rules stated by him, fixed the profits at $3.50 per car. Whilst the profits thus allowed seem to us to be high, still the evidence supports him in his finding of facts, and the measure of damages is the same as that approved in the former case. The objection is, therefore, not well taken.

5. This brings us to the objections made by the plaintiff on its appeal. The first relates to eight or ten thousand cars crossed at the Carondelet ferry. In 1872 a railroad known as the Conlogue road was built from the stock yards in East St. Louis down the river to East Carondelet, a distance of eight or nine miles from Bloody Island. There was a ferry at Carondelet, having a boat prepared for transferring cars, making connec-

tion on the west side of the river with the iron furnaces at that place and with two or three railroads extending west. The defendant delivered the cars now in question to the Conlogue road at East St. Louis, and that road took them to the Carondelet ferry, where they were transferred and turned over to a connecting carrier. No manifests were made out, as was the case when cars were transferred at Venice. The referee also finds that the cars thus transferred were, in every instance, turned over to the Conlogue road pursuant to the directions of the consignor or consignee, and not because the defendant elected to send them that way. At the date of the contract Carondelet was not within the corporate limits of the city of St. Louis, though it became a part thereof in 1871.

The contract speaks of such ferrying business as the defendant might have between St. Louis and the shore opposite thereto, on the Illinois side. It is plain to us that the ferrying business at a point eight or nine miles south of Bloody Island was never within the terms of the contract. Besides this there is no pretense of a claim that defendant sent these cars over the Conlogue road to avoid the plaintiff's ferry. They were turned over to that road as a connecting carrier, pursuant to the directions of the shippers, which directions defendant was bound to obey, and such a case is not within the terms of the contract, properly construed. The referee committed no error in excluding these cars.

6. There is no question made here concerning the amount allowed for rents, the same having been tendered by defendant from time to time when due; nor is it contended that interest should have been allowed on the amount due for rents, since defendant repeated the tender in its answer. But the plaintiff insists that interest should have been allowed from the nineteenth

day of September, 1881, the date at which the last suit was commenced, on the other amounts awarded.

Aside from the rent item, not now in question, this is a suit to recover damages for a breach of the contract, and the measure of damages is the loss of profits to the plaintiff. The case does not fall within the terms of section 5972, Revised Statutes, 1889; nor does it come within section 4430, by which a jury may allow interest in suits for the conversion of personal property. It has been repeatedly held by this court that interest can not be allowed in actions *ex delicto* based upon simple negligence of a party to whom no pecuniary benefit could accrue by reason of the injury inflicted. *Marshall v. Schricker*, 63 Mo. 308; *Kenney v. Railroad*, 63 Mo. 99; *Atkinson v. Railroad*, 63 Mo. 367; *Meyer v. Railroad*, 64 Mo. 542; *De Steiger v. Railroad*, 73 Mo. 33; *Wade v. Railroad*, 78 Mo. 362. Though these cases are not in exact point here, still we think it has not been the practice in the state, whatever it may be elsewhere, to allow interest on damages where the measure of damages is loss of profits. We are of the opinion the referee and the court did not err in refusing the demand for interest.

7. It follows from what has been said that the judgment should have been for $168,739 and no more. The judgment of the circuit court is therefore reversed, and a judgment will be entered here for the last named amount. BRACE and MACFARLANE, JJ., concur; BARCLAY, J., expresses no opinion at this time, but reserves the right to file an opinion hereafter.

PER CURIAM.—The foregoing opinion of BLACK, C. J., in division number one is adopted as the opinion of the court *in banc*, and in accordance therewith the judgment of the circuit court is reversed and judgment will be entered here for $168,739. BRACE, C. J., GANTT,

SHERWOOD, MACFARLANE and BURGESS, JJ. concurring.  BARCLAY and ROBINSON, JJ., dissenting.

### ON MOTION TO MODIFY JUDGMENT.

PER CURIAM.—The judgment herein will be modified and judgment entered in favor of plaintiff for the sum of $168,739 and all costs taxed in the circuit court, up to the filing of the motion for new trial; and in favor of defendant for all costs of the appeal thereafter.