515 F.Supp. 891 (1981)
BLAIR INTERNATIONAL, LTD., Plaintiff,
v.
LaBARGE, INC., Defendant and Third-Party Plaintiff,
v.
George ZACK, Third-Party Defendant,
and
Phillip K. Ewbank, Third-Party Defendant,
and
Ewbank International Division, Inc., Third-Party Defendant.
No. 78-640C(B).
United States District Court, E. D. Missouri, E. D.
April 3, 1981.
Lawrence Barker, Cleveland, Ohio, Robert Meyers, Clayton, Mo., for plaintiff.
Thomas Carney, St. Louis, Mo., for LaBarge.
Michael O'Keefe, St. Louis, Mo., for Phillip Ewbank & Ewbank International.
Lawrence Barker, Cleveland, Ohio, for George Zack.

*892 MEMORANDUM AND ORDER
REGAN, District Judge.
This diversity litigation is an offshoot of the early- and mid-1975 shortage of domestically produced steel products, and oil well casings in particular. The cast of characters consists of Petroleo Brasiliero S.A. (Petrobras), Blair International, Ltd. (Blair) and its president George Zack (Zack), Ewbank International Division, Inc. (Ewbank) and its president Phillip K. Ewbank, and LaBarge, Inc. (LaBarge).[1] Ewbank's business included buying and selling oil well products. Blair was a broker of tubular steel products, and one of LaBarge's divisions distributed tubular steel and other products. None of them was a manufacturer of casings.
Petrobras is a Brazilian corporation which had been granted by the Brazilian government exclusive rights to prospect for, refine and distribute petroleum products in Brazil. Having become apprised of Petrobras' need for oil well casings, Ewbank submitted a bid in March, 1975, offering to sell to Petrobras 98,400 feet of certain 26-pound casing and 79,090 feet of certain 29-pound casing for $6,351,010, none of which it had on hand. Shortly thereafter, Ewbank was informed that when the necessary Brazilian import license was obtained its bid would be accepted.
Blair, through Zack, then entered the picture in an effort to acquire for resale to Ewbank the casing it had offered to sell to Petrobras. To this end, Zack obtained from LaBarge a quote for Japanese-manufactured casing. However, it developed that Petrobras had specified that only domestically (United States) manufactured casing would be acceptable. Blair so informed LaBarge and was furnished a new quote at a higher price. Both the original and the revised quote contained the requirement that payment for the casing be made by irrevocable letter of credit.
At the time of the acute shortage, there were for practical purposes only two United States manufacturers of the type of casing Petrobras required. One of these, Jones & Laughlin Steel Corporation (J & L) was for many years a major supplier of LaBarge. It was LaBarge's purpose to obtain the casing from J & L, and because of the very good business relationship between these companies, it is evident that LaBarge was justifiably confident J & L would sell it the casing in question. Such a transaction would have been on open account, as was their practice. However, LaBarge would not place the order and commit itself to the purchase from J & L unless its customer first established a letter of credit in favor of LaBarge. Its reasons were understandable.
Wholly aside from the fact that the requirement of payment by irrevocable letter of credit was LaBarge's consistent policy before it would schedule production of or deliver products for export, LaBarge was concerned about the possibility that Blair (and later, Ewbank) might not consummate the transaction after LaBarge was committed to the purchase from J & L. In that situation, in addition to the damage to its relationship with J & L if it failed to complete the purchase, LaBarge would have been liable for a cancellation charge.
At some point in the transaction, but undoubtedly before May 6, 1975, Ewbank began dealing directly with LaBarge in an effort to assure that its highly profitable sale to Petrobras would not be jeopardized. As of that time, LaBarge had, by its acceptance of Blair's purchase order, agreed to sell the casing to Blair on condition that an irrevocable letter of credit be first furnished. Blair in turn had agreed to resell the casing to Ewbank at a higher price. Fully aware of LaBarge's requirement of a confirmed letter of credit as well as of Blair's inability to establish one, Ewbank *893 promised LaBarge that it would obtain the letter of credit. However, when LaBarge insisted on more than mere assurances, Ewbank agreed to deposit $50,000 in escrow primarily to indemnify LaBarge against liability in the event the letter of credit was not established. We have no doubt that when Ewbank initially agreed to provide the letter of credit it actually believed that it would be able to do so with the aid of Petrobras which it assumed (erroneously) would be forthcoming.
The terms of the escrow agreement were orally agreed upon prior to May 29, 1975, and were subsequently set forth in a written memorandum prepared by Ewbank and the bank's officer. The agreement provided that Ewbank would place $50,000 in escrow with the Farmers & Merchants National Bank in Fairview, Oklahoma, to be paid to LaBarge if Ewbank failed to produce the necessary letter of credit prior to June 20, 1975, provided that LaBarge had obtained a mill commitment by that date. The Farmers & Merchants National Bank was Ewbank's bank, and there was a very close relationship between the bank and Phillip Ewbank.
Prior to May 29, 1975, LaBarge had obtained a mill commitment from J & L to supply the casing, and on May 30, 1975, after the bank had been asked what type of document it would require, the bank received a mailgram from J & L verifying the commitment and a copy was supplied by the bank to Ewbank. Ewbank voiced no complaint respecting the adequacy of the mill commitment or its sufficiency as a compliance with the escrow agreement, and with full knowledge of its contents deposited the $50,000 in the escrow account on June 5, 1975. In these circumstances, it was aware that LaBarge would make its purchase from J & L in the belief that no further action on its part was necessary.
Of importance is the fact that in the steel business there is no specific document which is generally recognized as a "mill commitment." Unquestionably, the bank officer in charge of the escrow (a personal friend of Phillip Ewbank) had no knowledge of what a mill commitment was. What those in the industry understand by the term is simply an agreement, which may be oral, whereby the manufacturer states that it will supply a designated product to its customer. We find that the verified mill commitment of J & L sufficed for purposes of the escrow agreement and complied therewith. Nevertheless, without notification to LaBarge or even a complaint respecting the nature of LaBarge's compliance, the bank, on June 25, 1975, complied with Ewbank's request to return the escrow deposit, in spite of the fact that no letter of credit had been established.
Theretofore, shortly after June 5, 1975, by mutual agreement with Blair and LaBarge, Ewbank had assumed the contractual obligations of Blair, so that the sale of the casing would be made by LaBarge directly to Ewbank. The requirement of an irrevocable letter of credit remained as a condition of the sale to Ewbank, and in our judgment the overall conduct of the parties (Section 2-204, Uniform Commercial Code) recognized Ewbank's continued obligation to furnish the letter of credit.[2] As of that time, Ewbank undoubtedly believed it could obtain the necessary letter of credit, which it was diligently but unsuccessfully attempting to do.
It was not until later in the year, when market conditions had eased, that Ewbank changed its position. By then, it was obvious to Ewbank that it would be unable to *894 comply with its agreement to furnish a letter of credit in favor of LaBarge. In the latter part of August, 1975, with the aid of Blair, Ewbank secretly contracted with other suppliers to obtain the casing without a letter of credit and at a lower price on a portion of the casing. Armed with these contracts, Ewbank "cancelled" the LaBarge order, falsely stating as the sole reason therefor that the cancellation was "due to the expiration date" of the Petrobras import license. Not only was the import license still in effect, but by contracting with other suppliers Ewbank demonstrated that it had no reason to believe the license would not be renewed. We add that in no event was a current Petrobras import license a stated condition of LaBarge's sale to Ewbank.
Under the circumstances here present, Ewbank's failure to furnish the agreed-upon letter of credit[3] and its tongue-in-cheek "cancellation" of the sales contract without a valid reason constituted a repudiation and breach of contract rendering it liable in damages to LaBarge. See Section 2-610, Uniform Commercial Code. We do not credit Ewbank's testimony that it was LaBarge which repudiated the contract.
The only proper and adequate measure of damages available to LaBarge is the profit it would have realized had the contract been performed. Section 2-708(2), Uniform Commercial Code. We find that LaBarge was at all times ready, willing and able to perform its contract with Ewbank and that it would have done so but for the breach thereof by Ewbank. Had the contract been performed, LaBarge would have made a net profit on the transaction in the sum of $472,148. On the other hand, Ewbank made a gross profit on the transaction of over $2,853,000, which was some $1,478,000 more than it would have realized had it performed the LaBarge contract. It is clear to us that the desire to reap this additional profit was a major factor in Ewbank's repudiation of the contract.
We have resolved the disputed issues of fact in favor of LaBarge. In particular, we do not credit Ewbank's testimony that it merely promised to attempt to obtain the letter of credit. In light of all the circumstances, the credible evidence is to the effect that Ewbank unconditionally agreed to provide the letter of credit. So, too, we hold that the documents in evidence signed by Ewbank are sufficient to satisfy Section 2-201(1) of the Uniform Commercial Code Statute of Frauds.
It follows that LaBarge is entitled to judgment against Ewbank for the amount of its lost profits, together with the amount of the escrow deposit which Ewbank wrongfully obtained from the Merchants & Farmers National Bank.
In its counterclaims and third-party complaints, LaBarge set forth several alternative claims. We have sustained the breach of contract claim. Accordingly, and because of the dismissal of the contract interference claims against Blair and Zack, we have concluded that all claims of LaBarge other than those expressly ruled in this Memorandum should be dismissed without prejudice.
The foregoing memorandum constitutes our findings of fact and conclusions of law. Judgment will be entered in accordance herewith.
NOTES
[1] At its commencement this case was an action by Blair against LaBarge, alleging breach of contract. LaBarge impleaded Ewbank, Phillip K. Ewbank and Zack as third-party defendants. For reasons not presently pertinent, the Court dismissed Blair's claim without prejudice, and based thereon LaBarge dismissed its counterclaims against Blair and Zack, also without prejudice.
[2] Pointing to the fact that on June 18, 1975 it sent its own purchase order to LaBarge without making reference to the letter of credit and that in its June 25, 1975 acknowledgement thereof, LaBarge stated that it was contingent upon the receipt of the irrevocable letter of credit, Ewbank urges that under Section 2-207, Uniform Commercial Code, the requirement of a letter of credit was an additional term which materially altered the purchase order and thus did not become part of the sales agreement. However, as we view the evidence, Ewbank and LaBarge had already theretofore orally agreed upon the terms of the contract, including the establishment of a letter of credit, and the purchase order was merely intended as a confirmatory memorandum. Cf. Luria Bros. & Co. v. Pielet Bros. Scrap Iron, 600 F.2d 103 (7 Cir. 1979).
[3] Section 2-325(1) of the Uniform Commercial Code expressly provides that the failure of the buyer seasonably to furnish an agreed letter of credit is a breach of the contract of sale.