**BLAIR INTERNATIONAL, LTD.,**

v.

**LaBARGE, INC., Appellee, Cross-Appellant,**

v.

**George ZACK & Phillip K. Ewbank, Ewbank International Division, Inc., Appellant, Cross-Appellee.**

**Nos. 81–1626, 81–1689.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1982.

Argued March 5, 1982.

Rehearing Denied April 13, 1982.

Thompson & Mitchell, William G. Guerri, argued, Michael D. O'Keefe, Stuart Oelbaum, St. Louis, Mo., for appellant Ewbank Intern. Div., Inc.

Mark G. Arnold, Thomas M. Carney, argued, Thomas M. Boudreau, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for defendant-third party plaintiff-appellee.

Before LAY, Chief Judge, and ROSS and ARNOLD, Circuit Judges.

ROSS, Circuit Judge.

In March of 1975, appellant Ewbank International Division, Inc. (Ewbank) submitted a bid to supply steel oil well casing to Petroleo Brasiliero S.A. (Petrobras), the corporation granted exclusive rights by the Brazilian government to engage in exploration, refining and distribution of oil. Although Ewbank did not manufacture oil well casing, its business included buying and selling oil well products for export to foreign countries. Pursuant to the bid, Ewbank was to supply Petrobras with 98,400 feet of 26-pound casing, and 79,090 feet of 29-pound casing for $6,351,010. Shortly after it submitted its bid Ewbank was informed that it would be awarded the contract when Petrobras obtained its import license. Formal acceptance of the bid was sent by Petrobras on July 17, 1975.

Ewbank had none of this casing on hand and, therefore, needed to find a manufacturing source. Ewbank was contacted by George Zack, president of Blair International, Ltd. (Blair), a broker of tubular steel products. Blair intended to obtain the steel oil well casing from appellee LaBarge, Inc. (LaBarge), which was to obtain the casing from a manufacturer. Blair would then sell the oil well casing at a higher price to Ewbank. Payment by Blair to LaBarge was to be made by an irrevocable letter of credit.

The requirement of a letter of credit was a consistent policy of LaBarge, particularly in transactions including large sums of money. Furthermore, at the time the negotiations between Ewbank, Blair and LaBarge were taking place there was an acute shortage of domestically produced steel oil well casing. It would appear that there were only two United States manufacturers which could produce the type of casing required by Petrobras. One of these manufacturers was Jones and Laughlin Steel Corporation (J&L), which had been a major supplier to LaBarge for many years. LaBarge was confident that it would be able to acquire the casing from J&L on an open account basis. However, in order to protect its good relationship with J&L and avoid any possible cancellation charge in the event that Blair failed to consummate the transaction, LaBarge would not place the order with J&L until Blair established the letter of credit. There is no question that Ewbank was aware of the letter of credit requirement in the deal between LaBarge and Blair.

Prior to May 6, 1975, it became evident that Blair would be unable to provide a letter of credit and that Ewbank's interests would be better served by dealing directly with LaBarge. Although Blair was no longer directly involved in the transaction between Ewbank and LaBarge, Blair's commission was still to be paid out of the proceeds of the sale of casing by LaBarge to Ewbank, and George Zack, Blair's president, remained very active in the subsequent negotiations.

Although the written purchase order, number 1077, dated June 18, 1975, from Ewbank to LaBarge did not mention a letter of credit requirement, the district court found that sometime prior to that date, when Ewbank began dealing directly with LaBarge, Ewbank had orally promised to provide a letter of credit. LaBarge had orally agreed to provide the casing at a certain price and for a certain delivery date. By the end of May Ewbank had not been able to acquire a letter of credit, but it wanted LaBarge to place a firm order with J&L to assure that the September 1975 delivery schedule to Petrobras would be met. LaBarge, on the other hand, was not willing to commit itself to J&L unless it had assurance by way of a letter of credit that the transaction would be consummated by Ewbank.

Therefore, sometime prior to May 29, 1975, an escrow agreement was orally reached. Under this agreement, memorialized in writing by Ewbank on June 5, 1975, Ewbank deposited $50,000 in an escrow account in the Farmers & Merchants National Bank in Fairview, Oklahoma. LaBarge was to produce a "mill commitment" by June 20, 1975, indicating that its supplier (J&L) would be able to provide the steel casing at a certain price with delivery com-

mencing in September 1975. Ewbank was to establish a letter of credit in favor of LaBarge by June 20, 1975. In the event that LaBarge produced the "mill commitment" and Ewbank failed to establish a letter of credit by June 20, 1975, the $50,000 was to be forfeited to LaBarge. However, if LaBarge failed to obtain the "mill commitment" the escrow deposit would be refunded to Ewbank.

On May 30, 1975, J&L, at LaBarge's request, sent a mailgram to the Farmers & Merchants Bank which the district court found to be the necessary "mill commitment." Ewbank made no response to this mailgram and deposited the $50,000 with the bank on June 5, 1975. On June 23, 1975, J&L advised LaBarge by letter that due to the delay in formalizing the obligation it would no longer be able to meet the September delivery schedule. On June 25, 1975, the bank complied with Ewbank's request to return the deposit on the grounds that LaBarge had not produced the necessary "mill commitment." LaBarge made no complaint concerning the escrow agreement until mid-September 1975.

Apparently, during June, July, and the early part of August Ewbank continued to attempt to procure a letter of credit; LaBarge continued to indicate its ability to obtain the casing, although at a delivery date later than September 1975. In late August 1975, Ewbank contracted to acquire a portion of the steel casing from other suppliers without a letter of credit and at a lower price. On September 3, 1975, Ewbank wrote LaBarge that it was cancelling its order with LaBarge due to the expiration date of the Petrobras import license.

Almost four years later when appellee LaBarge was sued by Blair for its expected profits on the defunct transaction,[1] LaBarge filed a third party complaint against Ewbank alleging, *inter alia*, breach of contract and breach of the escrow agreement. On April 3, 1981, the district court[2] found

that Ewbank had breached its contract and the escrow agreement. *Blair International, Ltd. v. LaBarge, Inc.*, 515 F.Supp. 891 (E.D. Mo.1981). The court awarded LaBarge $50,000 under the escrow agreement and $472,148 in lost profits under the contract. Ewbank appeals contending that: (1) the trial court erred in concluding that it had breached its contract in that its procurement of a letter of credit was a condition precedent to the formation of a contract; (2) the trial court erred in concluding that LaBarge had provided a "mill commitment," and, therefore, Ewbank had not breached the escrow agreement when it failed to obtain a letter of credit; (3) the measure of contract damages applied by the court was incorrect. LaBarge cross-appeals on the grounds that the trial court erred in failing to award prejudgment interest on the damage awards. After thorough consideration of the somewhat tangled and perplexing evidence in this case, we affirm in part and reverse and remand in part.

*Contract Claim*

◼ On appeal Ewbank essentially argues that no contract with LaBarge was ever formed because the procurement of a letter of credit was an unmet condition precedent to the formation of a contract. LaBarge counters that it had a contract with Ewbank, and that the promise by Ewbank to provide a letter of credit was only a condition precedent to LaBarge's duty to perform. Although this court has recognized that a letter of credit may be a condition precedent to the formation of a contract under Article 2 of the Uniform Commercial Code, the question of whether the parties intended a letter of credit to be a prerequisite to contract formation or merely a condition of the contract is a question of fact. *See M. K. Metals, Inc. v. Container Recovery Corp.*, 645 F.2d 583, 587–88 (8th Cir. 1981). The findings of fact by the trial court in a contract action are reviewed under the clearly erroneous standard of Fed.R.

---

1. The district court dismissed Blair's claim without prejudice. *See Blair Int'l, Ltd. v. LaBarge, Inc.*, 515 F.Supp. 891, 892 n.1 (E.D.Mo. 1981).

2. The Honorable John K. Regan, Senior United States District Judge for the Eastern District of Missouri.

**958** ·

Civ.P. 52(a). "A finding of fact is clearly erroneous if, upon review of the entire record, the reviewing court forms 'the definite and firm conviction that a mistake has been committed.'" *Layne-Minnesota, Inc. v. Singer Co.*, 574 F.2d 429, 432 (8th Cir. 1978) (citation omitted).

The district court in the instant case concluded that prior to the time at which Ewbank sent its June 18, 1975 purchase order to LaBarge, Ewbank and LaBarge had orally agreed upon a contract under which Ewbank was required to establish a letter of credit in favor of LaBarge, and that the "overall conduct of the parties (Section 2–204, Uniform Commercial Code) recognized Ewbank's continued obligation to furnish the letter of credit." *Blair International, Ltd. v. LaBarge, Inc., supra*, 515 F.Supp. at 893 (footnote omitted). The district court also noted that the fact that the Ewbank purchase order 1077, dated June 18, 1975, did not contain a letter of credit requirement did not preclude a finding that a contract with a letter of credit term previously had been agreed upon, and that the Ewbank purchase order merely served as a confirmatory memorandum. *Id.* at n.2.[3] The district court concluded that under U.C.C. §§ 2–325(1)[4] and 2–610, the failure of Ewbank to provide a letter of credit and its eventual cancellation of the contract constituted a repudiation and breach of the contract entitling LaBarge to an award of damages.

The following evidence clearly supports the trial court's findings and conclusions: (1) On at least six occasions during his deposition and at trial Phillip Ewbank, the president of Ewbank and a principal participant in the transaction, testified that he believed that LaBarge and Ewbank had entered into a contract under which LaBarge was obligated to provide the oil well casing. (2) David Snip, a manager at LaBarge in 1975 and a principal participant in the transaction, testified that throughout his dealings with Ewbank there was an absolute promise by Ewbank to obtain a letter of credit as part of the contract.[5] (3) Virtually all communications, both written and oral, between Blair and LaBarge prior to the direct dealings between Ewbank and LaBarge clearly evidenced a letter of credit requirement as part of the contract. There is no question that Ewbank was aware of this requirement. (4) Written memoranda from LaBarge to Ewbank, as well as to J&L, consistently contained references to the need for a letter of credit from Ewbank prior to any firm action by LaBarge. (5) On September 3, 1975, Ewbank cancelled its order for the casing from LaBarge based on the expiration date of the Petrobras import license rather than the grounds that a condition precedent to the formation of the contract had not been met.

■ In light of this and the other evidence in the record, we conclude that the district court was not clearly erroneous in finding that (1) at some time prior to the date Ewbank's purchase order was sent (June 18, 1975), and, consequently, prior to the date when J&L could no longer meet the delivery date (June 23, 1975), a contract existed under which Ewbank's promise to obtain a letter of credit was a condition precedent to LaBarge's duty to perform,

---

3. Under U.C.C. § 2–201 a writing evidencing the existence of an oral contract "is not insufficient because it omits or incorrectly states a term agreed upon * * *."

    (2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

Comment 1 states: "The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction."

4. U.C.C. § 2–325(1) provides: "Failure of the buyer seasonably to furnish an agreed letter of credit is a breach of the contract for sale."

5. Snip's credibility on this matter is bolstered by the fact that as of September 1, 1975, he was no longer an employee of LaBarge.

and (2) that Ewbank breached that contract. Therefore, we affirm the district court's determination that Ewbank should be liable for breach of contract.

*Escrow Agreement*

█ As noted above, Ewbank was anxious to meet its September delivery schedule to Petrobras. Therefore, it wanted La-Barge to provide some assurance that it had the ability to procure the oil well casing. LaBarge was hesitant to place even a contingent order for the casing with J&L without some protection in the event that Ewbank failed to consummate its purchase. Consequently, sometime before May 29, 1975, the parties entered into an escrow agreement. The terms of the agreement were set out on June 5, 1975, in a written memorandum prepared at Ewbank's direction by an officer at the Farmers & Merchants Bank in Fairview, Oklahoma. The key provision stated that:

> This escrow will be returned to Ewbank International Div. Inc. in the event of one of the following: (1) Completetion [sic] of the necessary letter of Credit to confirm order by Ewbank International Div. Inc. (2) Failure of LeBarge [sic] to bring forth the necessary mill committment [sic] as to the above mentioned specifications. (3) Reaching the dead-line date of June 20, 1975 and neither of the above two events have taken place. (4) Release from Le-Barge [sic] stating that they cannot fulfil the order.

On May 30, 1975, six days prior to the date when Ewbank's $50,000 escrow deposit was made and the terms of the agreement given to the bank, the bank received a mailgram from J&L which stated in part: "LABARGE INQUIRY FOR PETROBRAS 7 INCH OD PIPE WE CAN SHIP 500 TON PER MONTH STARTING SEPTEMBER APPROXIMATE TOTAL 2400 TON DELIVERY OFFER GOOD UNTIL JUNE 5[.]"

The district court, noting that there is no specific document which is generally recognized as a "mill commitment" and that Ewbank failed to offer any objection to the sufficiency of this mailgram, held that the J&L mailgram complied with the escrow agreement's requirement for a "mill commitment." We cannot agree with the district court's conclusion.

Regardless of what else might be argued concerning the nature of a "mill commitment," it is clear that the mailgram sent to the bank pursuant to the escrow agreement failed to meet the terms of the escrow agreement in that the J&L offer was good only until June 5, 1975. The express terms of the escrow agreement required a commitment from a manufacturer that was at least good through June 20, 1975. We note that LaBarge was aware of the written terms of the escrow agreement and at no time during the life of that agreement expressed any objections to those terms. Furthermore, although LaBarge argues that it was constantly assured by J&L that the offer was still good until at least June 20, 1975, there is no evidence whatsoever that either the bank or Ewbank was ever advised of that fact.[6]

In light of these facts, we hold that the district court's finding that the May 30, 1975 mailgram satisfied the escrow agreement "mill commitment" term was incorrect. Therefore, the district court's holding that Ewbank wrongfully obtained the $50,-000 escrow deposit is reversed.

*Damages*

The trial court found that the appropriate measure of the damages arising out of Ew-

---

**6.** We note that the purchase order submitted by LaBarge to J&L in order to obtain a "mill commitment" stated that "THIS PURCHASE CONTINGENT ON LABARGE RECEIPT OF ACCEPTABLE LETTER OF CREDIT FROM EQUIBANK IN PITTSBURGH, PENNSYLVANIA," and that at no time was a firm order placed with or production schedule established by J&L. Furthermore, it is of interest to note that LaBarge, upon reaching the June 20, 1975 expiration date without receiving a letter of credit from Ewbank, did not request the $50,-000 escrow deposit from the bank. In fact, it was not until September 18, 1975, after Ewbank had cancelled its order with LaBarge that LaBarge first attempted to obtain the escrow deposit.

bank's breach of the contract was La-Barge's lost profits under U.C.C. § 2–708(2). Section 2–708 of the Uniform Commercial Code provides that:

(1) Subject to subsection (2) and to the provisions of this article with respect to proof of market price (section 400.2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (section 400.2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 400.2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Mo.Ann.Stat. § 400.2–708 (Vernon 1965).

The trial court concluded that LaBarge's net profit on the transaction would have been $472,148. This amount was apparently arrived at by subtracting the amount on the June 5, 1975 LaBarge contingent purchase order to J&L ($3,670,762.60) from the amount on the June 18, 1975 Ewbank purchase order to LaBarge ($4,493,578.50). From this figure ($822,816.90), the amount stipulated to be Blair's commission ($283,745) and the amount of shipping expenses saved by LaBarge ($66,923) were deducted.

Ewbank essentially argues that the district court erred in applying the lost profits formula embodied in U.C.C. § 2–708(2) because the evidence was insufficient to establish that U.C.C. § 2–708(1) was inadequate to place LaBarge in the same position it would have been but for the breach. Ewbank contends that by June 23, 1975,

LaBarge was not able to meet the September 1975 delivery date and that there was no evidence of market price or contract price at the time and place for tender (September 1975) as required under section 2–708(1). Ewbank also apparently argues that the breach of the contract did not occur until Ewbank cancelled its order to LaBarge in writing on September 3, 1975. Therefore, Ewbank contends that even under section 2–708(2) there was insufficient evidence to establish what LaBarge's profit would have been because the only evidence presented related to the LaBarge contingent purchase order with J&L which expired June 23, 1975.

We cannot agree with Ewbank's contentions. First, we note that U.C.C. § 2–708(1) has been construed to be an inadequate measure of damages, and therefore section 2–708(2) applicable, in situations where the seller is a "jobber." *See Nobs Chemical, U. S. A., Inc. v. Koppers Co.,* 616 F.2d 212, 215 (5th Cir. 1980). To be classified as a "jobber" a seller must satisfy two conditions: "First he is a seller who never acquires the contract goods. Second, his decision not to acquire those goods after learning of the breach is commercially reasonable under 2–704." J. White & R. Summers, Uniform Commercial Code § 7–10, at 278 (1980). There is little question that LaBarge falls within this description. Since LaBarge never acquired the oil well casing, actions for resale or on the price would be inapplicable. Furthermore, LaBarge's decision not to acquire the casing under the market situation in the summer of 1975 cannot be said to be commercially unreasonable.[7]

Moreover, appellant's argument that because there was no evidence of market price or contract price at the time of the breach there was insufficient evidence to establish lost profits rests on the erroneous assumption that the breach of contract occurred on September 3, 1975, when Ewbank cancelled its order. Although there is lan-

---

**7.** Evidence presented at trial indicated that by August of 1975 the demand for steel oil well products was beginning to ease and the market price was beginning to drop.

guage in the district court opinion to the effect that the "cancellation" constituted a breach of the contract, *see Blair International, Ltd. v. LaBarge, Inc., supra,* 515 F.Supp. at 894, the clear implication of the court's opinion is that the contract between Ewbank and LaBarge was breached when Ewbank failed seasonably to furnish the agreed letter of credit prior to J&L's notification to LaBarge on June 23, 1975, that it could no longer meet the September delivery date. *See id.;* U.C.C. § 2–325(1). Thus, the district court concluded that LaBarge's lost profits would be determinable from the June 5, 1975 LaBarge purchase order to J&L and the June 18, 1975 Ewbank purchase order to LaBarge. We cannot say that this finding of fact by the trial court was clearly erroneous, and therefore, we affirm the district court's award of $472,148 in damages.

## Liquidated Damages

■ Ewbank contends that, even if the contract was breached, the escrow agreement was intended as a modification of the contract establishing the $50,000 escrow deposit as liquidated damages. We note that Ewbank apparently raised this argument for the first time on appeal. Generally, this court will not consider arguments or theories that are not advanced in the district court proceedings. *See, e.g., Kapp v. Naturelle, Inc.,* 611 F.2d 703, 709 (8th Cir. 1979); *United States v. Frank,* 587 F.2d 924, 928 (8th Cir. 1978). Moreover, this court has concluded above that the escrow agreement and the contract with LaBarge are two separate and distinct entities. The evidence clearly shows that the escrow agreement was merely intended to protect LaBarge's relationship with J&L and to induce LaBarge to start performance before it had a duty to perform under the contract in order to assure a September delivery date.

## Prejudgment Interest

■ As cross-appellant, LaBarge argues that the trial court erred in failing to award prejudgment interest on the contract damage award under Mo.Rev.Stat. § 408.020 (Supp.1980). *See Slay Warehousing Co. v. Reliance Insurance Co.,* 489 F.2d 214, 215 (8th Cir. 1974) (where section 408.020 is applicable an award of prejudgment interest is not a matter of court discretion but is compelled).[8] Ewbank argues that under Missouri law prejudgment interest is not allowed where damages are based on lost profits. *Underwood Typewriter Co. v. Century Realty Co.,* 165 Mo.App. 131, 146 S.W. 448 (1912); *Wiggins Ferry Co. v. Chicago & A. R. Co.,* 128 Mo. 224, 27 S.W. 568 (1894), *aff'd,* 128 Mo. 224, 30 S.W. 430 (en banc 1899). Because the district court did not address the merits of LaBarge's argument, we remand this issue to the court for a determination of the appropriateness of prejudgment interest on the $472,148 contract damages award.

## Summary

In conclusion this court affirms the district court's finding that Ewbank breached its contract to purchase oil well casing from LaBarge and the district court's damage award of $472,148 based on LaBarge's lost profits. However, we reverse as to the district court's conclusion that LaBarge was entitled to the $50,000 escrow deposit. The question of whether or not LaBarge is entitled to prejudgment interest on the contract damages award is remanded for consideration by the district court.

---

**8.** In its complaint LaBarge sought, in addition to actual damages, "such other relief as this court may deem proper." This court has held that a prayer for "all proper relief" includes a demand for prejudgment interest. *City of* *North Kansas City v. Sharp,* 414 F.2d 359, 369 (8th Cir. 1969). LaBarge pursued this request for prejudgment interest in its February 17, 1981 post-trial memorandum submitted prior to judgment.